Good morning, Your Honors. This is Jeremiah Donovan for Mr. Becton. Could I just inquire that I'm being heard? Yes, you're being heard. Judges, the Sentencing Commission produces sourcebooks that survey the sentences that are imposed throughout the country, and in 2019, the mean sentence for murder in this circuit was 255 months, and the median sentence was 280 months. Since my appointment to represent Becton on appeal, I've been trying somehow to get him to that from his life sentences, both in my journals with the prosecution and this brief, and I suppose in any future proceedings that we might have. I'm sorry to break in now, it's not time, but it's relevant to what you just said. The question is whether by doing this, do you open him up, if you were to win, do you open him up to the possibility of a death sentence that he otherwise is not in danger of? Well, I suppose if he were permitted to withdraw his plea, he would open himself up to that, and he recognizes that and indicates that he would rather take his chances. I mean, Henderson, the co-defendant, went to trial and was acquitted on the capital count, and I think that provides Becton with some source of encouragement. But you're right, Judge, that could happen, and he understands that. Thank you. You know, it's an unusual case. I mean, the crime was committed in 2002, and the defendant was arrested in 2002. In 2006, he pleaded guilty. He wasn't sentenced for 12 years until 2018. During the course of those proceedings, he had five different judges, teams of different prosecutors. My friend, Mr. Maiman, the prosecutor, may deny this because I'm not sure it's true, but I would imagine that he was in high school when Becton entered his guilty plea in 2006. In the meantime, you know, while he was a judge, he absolutely transformed his life. He went from being a robber, a murderer, a drug dealer, into a highly respected, into a prisoner who was highly respected by members of the prison staff when he was sentenced. But I got a tough row to hoe, and the main row that's the hottest to hoe is the waiver of appeal, and so let me talk about that just for a second. The way I try to, there are two, I've got two waivers of appeal. The first is the waiver that took place in the initial plea agreement. I try to get around that by saying there was no inquiry during the course of the Rule 11 proceeding as to that, and so there's no way to tell whether that was a voluntary waiver or whether he understood what he was doing. The problem is we had this kind of unusual post-plea agreement, the plea modification proceeding in 2018 that gave certain benefits to Becton and also certain benefits to the written agreement that contained a similar waiver, and the judge who conducted the post-plea agreement did conduct an inquiry concerning the appellate waiver. Now, the way I try to get around that is that what Becton waived in the written agreements was he would not appeal a sentence of more than, originally it was life plus 60, and then I think in the second one it was life plus 5, but the way that the judge in the post-plea agreement, in the plea modification proceeding described it was different. He said essentially if you get a sentence of life plus 5 or less, you can't appeal, and that isn't right, I don't think. I think there were all sorts of things that he could appeal if he had imposed special assessments far in excess of what was authorized or if there were conditions of supervised release that were not permitted. He could have appealed those. Now, the government says, well. This is Judge Katzmann, how are you? I've got some questions, if I might. As you say, you have some challenges, some hurdles to overcome because the various challenges that you're raising were not raised below, so generally speaking, we review for plain error. So, if we start with the 11B1D challenge, the question really is that, to me, is whether there's a reasonable probability that Becton is guilty to a plea if Judge Owen had informed him that he was entitled to court-appointed counsel. And as I read the record, and please correct me if I'm wrong, he had been informed on multiple prior proceedings, including at least his initial one, and his arraignments on two superseding indictments. That counsel would be appointed for him if he couldn't afford it. And additionally, he was represented by appointed counsel for most of the time between his So, could you respond? I'm not sure I see how... I do my best in my brief to say that it wasn't uninterrupted. That is, he was appointed counsel. I think the initial arrest was not for murders, but for drug dealing. He was appointed counsel who ended up being his counsel throughout, right through the sentencing. But there was an interruption there when I think he probably went out and hired private counsel, and then new counsel came back in. That kind of cuts both ways in the sense that once private counsel went out, he got appointed counsel once again. But on the other hand, there was an interruption there. I think the other thing that I argue is that I quote from the judge's appointment of counsel indicating that this is such a complicated case, and it's such a... not a complicated case, but it's a capital case. It's such a burden on counsel to undertake that periodic payments were committed, et cetera. And so that the defendant could well have thought that because of the intention of it, he had a relative amount of work that would be required, and he might lose his counsel, and he lost his counsel, and he might have gone and hired another counsel. So that's really about all I can say. The government does do a good job, I have to say, in pointing out on various occasions. I have to admit that's a bit of a stretch. Well... There's not... You can't see. Fortunately, I'm not in front of you, so you can't see me stretching, may it please the court. Okay. Very good. Now, let me ask... Check Zoom next time, we promise. Thank you. And let me say, I very much appreciate the diligence with which you have proceeded in this case. Thank you. Let me ask you about the attempted arson and your challenge to the plea to attempted arson. Can you help me understand what the counter is to the government's argument regarding Pinkerton liability? You've got the case, for instance, of United States versus Romero, Second Circuit case, where we held that two defendants could be held liable for their co-conspirator's attempt to murder a federal officer during a drug bust. Why doesn't that kind of reasoning apply here? Because I think that Pinkerton requires at least that the defendant have some reasonable grounds to believe that the particular action could be a consequence. So that if two guys go in to rob a bank, they both agree nobody's going to get hurt, but we've got loaded guns, and one of the guns goes off by accident and somebody dies. I think that the co-defendant is responsible under Pinkerton because he went in with the guns knowing it was loaded. If Bechtin were saying, hey, I was just going in to rob the guys, I didn't know that the people inside were being murdered, I think that would be covered by Pinkerton. But this thing here, that they detached the gas lines in order to light up the house, in order to destroy evidence, I don't think that was reasonably foreseeable to Bechtin. Bechtin says he didn't learn about it until after the robbery was all over. And the murders, I think, those fall within Pinkerton, but the detaching of the gas line, the lighting of the candles, I don't think that was reasonably foreseeable to Bechtin. It shouldn't fall within Pinkerton. Judge Wesley? Well, with regard to that, I mean, he just participated in the murder of three people, right? I mean, he was leaving a murder scene. They had made very detailed arrangements with regard to the purchase of other clothing and the disposition of clothing they had on, and yet they were leaving behind obvious evidence of a capital offense. One would think that it's conceivable that one might try to cover that up, don't you think? Yeah, I mean, I suppose so. Do you think it's reasonable to think that someone had an idea that let's get rid of the bodies? Sure, I mean, and if what we were talking about was a crime of disposing of evidence, I'm sorry, of concealing evidence, or of lying to investigators concerning the murders, that I think would fall within Pinkerton. But the crime of burning down an apartment building, I just don't think that's foreseeable. There are many murders that occur where the victim ends up being incinerated in a car or in a home. That's not unusual, is it? I'm not sure that that would have been foreseeable to, I don't think Bechtin had done any careful analysis of those murders. Does he have to do a careful, the question is whether it's reasonably foreseeable, isn't it? Right, right. So put yourself in Bechtin's, if you would, put yourself in Bechtin's position. I can't conceivably put myself in Bechtin's position, but I can put myself in the position of a reasonable individual who performs that kind of activity. And one of the things I think I'd be concerned about, which he obviously was concerned about, was what about the evidence that's going to lead to me? So he took care of his clothes. One would think that he might be concerned that he took the time to make those detailed arrangements with his co-conspirators. So that one would think that he took the time to also consider the prospect of hiding the most damning evidence of all, the bodies. Yeah, but I'm not sure that he would have, I think that's true. I think that, and again, as I say, what we're talking about is just, it is reasonably foreseeable that they will take some actions in order to conceal the crime. I think that's right. It is reasonable to think that they would do something to conceal the crime? That they would do what was necessary to conceal the crime. Sure, I think I'd be stupid not to argue that. In any crime that anybody commits, anybody committing a crime, it is reasonably foreseeable to him that we will do what is necessary in order to conceal the crime. But whether the burning down of the apartment building is foreseeable as being something that's necessary in order to conceal the crime. So you're saying that if they, I'm sorry, but if he had exploded a small atomic bomb there, that would not be foreseeable even though it was meant to cover up the crime? Right, right. Okay. Fair enough. I have no further questions. Judge Stack, any further questions? No, thank you. Mr. Donovan, you'll have two minutes for rebuttal. We'll hear from Mr. Maimon. Chief Judge Katzman, and may it please the court. Judge Katzman. My name is Michael Maimon. No longer chief. Sorry? No longer chief. Oh, no. Yeah. Oh, yes. Oh, yes. Term ended August 31st. Chief Judge Katzman Emeritus, and may it please the court. They say that emeritus means, e means you're out, and meritus means you deserved it. Confidence from my colleagues. In 2002, Sherrod Becton was the leader of a violent drug and robbery crew calling himself Murder Unit, and he teamed up with two fellow Murder Unit members to rob a pair of Mexican drug traffickers. He planned for the robbery to be brutal, bloody, and lethal. Before the robbery, he purchased new clothes for the robbers to change into after removing their bloody clothes, gloves for them to wear during the robbery, and he brought guns for everyone. When the robbery occurred, Becton and his cohorts tied up the traffickers, as well as Daryl Henderson's girlfriend, who was acting as the inside man. They proceeded to torture the traffickers, beating and cutting them. In fact, Becton beat one of them so badly that his glove was bloody and his hand was swollen. The robbers then killed all three victims, including Henderson's girlfriend, who was not an intended victim, but rather had become a witness to a murder, and that was sufficient reason for the three of them, including Becton, to kill her. They cut their throats so viciously that you could see the victim's spines from the front. Becton and the others fled and literally partied in Miami with their newfound wealth. For this, Becton was charged with capital crimes, and the government actually sought the death penalty. In November 2006, literally days before trial was scheduled to begin, Becton, with two CJA-funded appointed counsel by his side, pleaded guilty to the indictment with a 50-year mandatory minimum and an advisory guideline sentence of life plus 30 years. In return, the government took the death penalty off the table. In 2012, Becton entered into a post-plea agreement before Judge Castel, again accompanied by his two CJA-funded appointed counsel. In that agreement, Becton faced a mandatory minimum of 25 years' imprisonment and an advisory guideline sentence of life plus five years, waiving his right to appeal any sentence of or below life plus five years' imprisonment. For these crimes, Judge Castel engaged in a thorough sentencing proceeding, aided by lengthy detailed submissions by both parties and an extensive colloquy with the attorneys and Becton himself. Judge Castel considered all of the parties' arguments and ultimately concluded that a sentence below life plus five years' imprisonment would not be sufficient to accomplish the goals of Section 3553A, notably in explaining that he did not even bring up the attempted arson but rather relied upon all of Becton's other actions. His appeal of both his conviction and sentence is without merit. First, regarding the sentence, Becton waived the appeal of his sentence in his post-plea agreement. That's in his sealed appendix at 13. Judge Castel drew Becton's attention to that appellate waiver and Becton agreed under oath that he understood the terms of his appellate waiver. That's at the sealed appendix 86. Mr. Maimon, I have a question for you on the arson attempt. Can you give me an instance of a crime that would not have been foreseeable if it had been committed by one of Mr. Becton's co-conspirators? Well, presumably the example that Judge Sack gave earlier of an atomic bomb would not be because nobody could foresee that it could even be done. That is, nobody could foresee that somebody would have access to an atomic bomb. But I think that in a proceeding where not only had Becton prepared to clean the scene and cover his tracks by, among other things, getting a fake ID, buying new clothes in advance of the murder, buying gloves for everybody, but also at the murder itself where they had already killed somebody who was, for lack of a better word, an innocent or even less than innocent, one of their own because she had become a witness to the murder, it's hard to say that potentially killing others who would somehow provide evidence of the murder would be beyond the pale or would not be reasonably foreseeable. For this reason, it doesn't matter that we don't know who actually lit the candles or knocked out the gas line. This is precisely what Pinkerton is intended to cover. I would bring up, Your Honor brought up Romero, and I think Romero provides the broad context of Pinkerton liability. At United States v. Romero, 897 F. 3rd 47 at 51, this court said that given the ammunition spread around the apartment, the precautions Romero and Rodriguez took to ensure the informants were neither armed nor police, and the stationing of Santos as an armed triggerman in the closet, the jury had ample evidence from which to conclude the conspirators had contemplated and prepared for using the gun. Under those circumstances, there was sufficient evidence to conclude that Santos' use of the gun was a reasonably foreseeable consequence of the narcotics conspiracy. Here, similarly, they went into the apartment, they used whatever tools were at hand, in addition to the guns that they had with them, to torture and murder people, including somebody who was not an intended target but had become a witness. I do think that at that point it is reasonably foreseeable that members of the conspiracy would continue to use tools that were actually at hand, in this case, candles and a gas line that were in the apartment, to continue to cover up their crime by potentially killing others if necessary. Let me also ask you about appeal waiver enforceability. Your adversary, as I understand him, contends that the district court did not inform him of the various kinds of appeals that Mr. Becton was committed to bring. Let's say that Mr. Becton attempted to bring one of those kinds of appeals. If, for instance, he said that there had been a miscalculation in his mandatory special assessment, would an appeal waiver still be enforceable? I think it may not be under those circumstances. Here the judge limited his discussion of the appeal waiver to the waiver of an appeal or collateral challenge to the prison sentence. He did not discuss it. I have to admit it is unclear to me whether these other potential consequences are automatically waived if they are within the appeal waiver, but the judge hasn't described them. The law talks about bringing the defendant's attention to the appeal waiver, and I think that there is a good argument that once you've brought the defendant's attention to part of the appeal waiver, you can say the defendant understands the whole appeal waiver. But I think that that's an academic question here, because there's no question that the part of the sentence that Becton is appealing, namely the term of imprisonment, is precisely the part of the appeal waiver that Judge Castell quite accurately described on the record, and that Becton specifically said that he understood at the time. Thank you. Judge Wesley? I have no further questions. Thank you. Judge Sack? No, thank you. Unless the court has any further questions, we'll rest on our briefs. Thank you, Mr. Maiman. Mr. Donovan, you'll have two minutes for rebuttal. I just have a few little points to make. Back when I was a prosecutor, I didn't get a chance to rebut this from you, so I didn't have a chance to think about the questions asked and come up with a better answer. You were never an appellant. But actually – yeah, I had suppression one time, but I – but with respect to the question of were there crimes that could have been committed that wouldn't have been within Pinkerton, I think maybe if they had raped – if one of the defendants had raped Louise Butler, who was the inside person, that might have been beyond the scope of anything that Becton could have planned. When I listen to the prosecutor's statement of facts, I'm reminded of the second big hurdle that I face, and that is in order to get any relief, I have to establish that the sentence is reasonably high or I'm thinking it's so shockingly high, shockingly high, shockingly low. And what I say to that is if he had been sentenced a year after the murders, I think that the sentence wouldn't have been shockingly high. But given the fact that so many years passed and he had changed so much – Can you – I'm sorry to break in, but could you explain very briefly to me – I'm sure it's in front of me here – but why it took such an extraordinary length of time before a sentence was passed? Well, all the reasons that are set forth in the – that are discussed in the sealed appendix. Yeah, yeah. That was all going on. As I said, he dealt with teams of prosecutors. Mr. Maiman – you notice the third point I guess I'd make is Mr. Maiman did not deny that he was in high school at the time. But he went through – yeah, he went through teams of prosecutors during that period, and that's why it took so long. So for all the reasons that I've set forth in my brief and during the course of the argument, I hope you'll grant them the will to speak. Close for your arguments. The court will reserve decision.